16-909-cr
United States v. Nina

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 17th day of May, two thousand eighteen.

PRESENT:  GERARD E. LYNCH,
                    CHRISTOPHER F. DRONEY,
                              *Circuit Judges*,
                    WILLIAM K. SESSIONS III,
                              *District Judge*.[*]

_____

UNITED STATES OF AMERICA

        *Appellee*,

    v.                                                                          No. 16-909-cr

ADONY NINA,

        *Defendant-Appellant*,

CANDIDO ANTOMATTEI, JORGE CRUZ, TIARA FELIX, STEPHANIE MESA, JASON MORALES, EDUARDO RODRIGUEZ, TOMMIE BOOSE, CATHERINE MORALES, KEVIN TORRES, KRISTINA SIMMONS,

_____

[*] Judge William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

*Defendants.*[**]

FOR DEFENDANT-APPELLANT:     SETH GINSBERG, Law Office of Seth Ginsburg,
                             New York, NY.

FOR APPELLEE:                CHRISTOPHER J. DIMASE, Assistant United
                             States Attorney (Margaret Graham, Sarah
                             Krissoff, Rebecca Mermelstein, Diane Gujarati,
                             Assistant United States Attorneys, *on the brief*),
                             *for* Geoffrey S. Berman, United States Attorney
                             for the Southern District of New York, New
                             York, NY.

Appeal from the United States District Court for the Southern District of New York (Sullivan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

Defendant-Appellant Adony Nina appeals from a judgment of conviction entered on March 22, 2016, after two jury trials, sentencing him to life imprisonment. The convictions stem from Nina's leadership of a violent heroin and crack-cocaine dealing organization in the Bronx, referred to below as "the Crew." We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

The trial on the seventh superseding indictment (hereinafter "2013 Indictment") took place in October 2013, and the trial on the twelfth superseding indictment (hereinafter "2015 Indictment") took place in May 2015. At the conclusion of the first trial, Nina was found guilty of conspiracy to distribute narcotics, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) (Count One of 2013 Indictment), and using and possessing a firearm to commit a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three of 2013 Indictment). At the conclusion of the second trial, Nina was found guilty of the murder of Aisha Morales in connection with a drug trafficking offense, in violation of 21 U.S.C. § 848(e)(1)(A) (Count One of 2015 Indictment), and using and possessing a firearm to commit that murder in connection with the drug trafficking offense, in violation of 18 U.S.C. § 924(j) (Count Two of 2015 Indictment). Nina was sentenced to concurrent terms of life imprisonment on Count One of the 2013 Indictment and Count One of the 2015

---

[**] The Clerk of Court is directed to amend the caption as set forth above.

Indictment, a consecutive term of life imprisonment on Count Two of the 2015 Indictment, and a consecutive term of 10 years' imprisonment on Count Three of the 2013 Indictment.[1]

On appeal, Nina argues that: (1) a judgment of acquittal should have been entered with respect to both counts of conviction in the second trial because the Government failed to prove a sufficient connection between the homicide and the drug conspiracy; (2) he is entitled to new trials on all counts due to the admission at both trials of evidence of certain instances of violent conduct that he argues is irrelevant; (3) the district court erred in denying his motion for a mistrial during the first trial on the basis that the Government elicited testimony that a woman with whom Nina was in a sexual relationship was 16 years old at the time of the relationship; (4) his conviction for murder in connection with a narcotics trafficking offense in the second trial should be vacated because the 2015 indictment failed to specify the quantity of drugs associated with the narcotics conspiracy; (5) his sentence for violating 18 U.S.C. § 924(j)(1) was procedurally unreasonable because the district court incorrectly held that that sentence had to run consecutively to the other sentences imposed; and (6) his life sentence for conspiracy to distribute narcotics was substantively unreasonable. We reject all of these arguments, and affirm his conviction and sentence.

Nina first argues that his convictions under 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 924(j) in the second trial must be set aside because the Government failed to prove a connection between the murder and the narcotics conspiracy. 21 U.S.C. § 848(e)(1)(A) provides for a mandatory minimum sentence of 20 years' imprisonment, and a maximum sentence of the death penalty or life imprisonment, for anyone "engaging in" a narcotics trafficking offense involving (as relevant here) more than one kilogram of heroin or 280 grams of heroin base, "who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual." 18 U.S.C. § 924(j)(1) authorizes the death penalty or life imprisonment for murder committed "in the course of" a violation of 18 U.S.C. § 924(c). Section 924(c) proscribes the unlawful use or possession of a firearm "in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A).

In order to prove that the defendant committed the murder "while engaging in" a narcotics trafficking offense, "the government need only prove beyond a reasonable doubt that *one* motive for the killing . . . was related to the drug conspiracy." *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008). Accordingly, "[t]he existence of other motives does not affect the government's ability to satisfy the 'engaging in' element, as long as there is a substantive connection between the defendant's role in the murder . . . and his participation in the drug conspiracy." *Id.* Moreover, "[t]he government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose."

---

[1] A single judgment of conviction was entered by the district court reflecting the sentences on both the 2013 Indictment and the 2015 Indictment.

*Id.* Similarly, in order to sustain a conviction under section 924(j), the Government must prove "that during and in relation to [an] underlying [drug trafficking] offense [the defendant] knowingly used or carried a firearm," and used that firearm to murder the victim. *United States v. Wallace*, 447 F.3d 184, 187 (2d Cir. 2006).

We review *de novo* the denial of a motion for a judgment of acquittal. *United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003). To prevail on a motion for judgment of acquittal, the defendant must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (internal quotation marks omitted). In evaluating whether a defendant has made this requisite showing, "we consider all of the evidence, both direct and circumstantial, in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government," *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (internal quotation marks omitted), and "resolv[ing] all issues of credibility in favor of the jury verdict," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

Here, the Government presented evidence of the following at the second trial: Bobby Morales and William Viera—who were not Crew members—were distributing narcotics in an area that the Crew believed to be its territory. During the year preceding Aisha Morales's murder, Crew member Cathy Morales[2] told Viera to "get down or lay down," meaning that if he did not start selling for the Crew, the Crew would injure or kill him. T2 1316.[3] A few days later, Candido Antomattei—another Crew member and brother of Cathy Morales—approached Viera and told him to stop selling on the Crew's turf, "or else." T2 1317. According to Desiree Morales—the sister of Bobby Morales and Aisha Morales—Nina was with Antomattei at that time. When Viera asked Antomattei "[o]r else what," Antomattei responded by lifting up his shirt and displaying his pistol to Viera. T2 1317. Nina and Antomattei then physically assaulted Viera.

In May of 2011, the month before the murder of Aisha Morales, Cathy Morales told Bobby Morales during an argument that he could not distribute narcotics in the Crew's territory, and that if he continued to do so, there would be "problems." T2 1530. A few weeks later, Nina—accompanied by Cathy Morales—displayed a firearm to Bobby Morales during an argument.

Then, in the days leading up to Aisha Morales's murder, Cathy Morales told Desiree Morales that she had a problem with Viera selling narcotics in the Crew's territory. On the day of the murder—June 28, 2011—Desiree Morales learned that Cathy Morales had

---

[2] It appears that Cathy Morales is not related to Aisha Morales, the decedent. To avoid confusion, individuals with the last name Morales are referred to throughout this summary order either by their full names or just their first names.

[3] "T1" refers to the transcript of the 2013 trial; "T2" refers to the transcript of the 2015 trial.

approached Bobby Morales and told him to tell Viera that Viera would either sell for the Crew or be killed.  This caused Desiree Morales to become angry with Cathy Morales.  Accordingly, Desiree confronted Cathy about Cathy having threatened Viera through Bobby Morales.  At the time of the confrontation, Desiree was with, among others, Aisha Morales and Stacey Gonzalez.  An argument broke out between the two sides, leading to Stacey Gonzalez punching Cathy.

Cathy then left, and shortly thereafter, was observed walking with Nina.  At that point, Nina looked towards Desiree Morales, Aisha Morales, and Stacey Gonzalez, and pointed his fingers at his own head and then towards the women, mimicking a gun.  Nina and Cathy entered a building, and Nina pulled out a gun and asked Cathy "[o]h, you going to do it or am I going to do it?"  T2 1552.  Afterwards, Nina and Cathy went back outside, with Cathy in possession of the firearm.

Cathy Morales and Nina then approached a group including Desiree Morales, Aisha Morales, and Stacey Gonzalez, with Cathy still in possession of the gun.  Nina said something to Cathy, and she then fired the gun at the group, hitting Aisha in the head and killing her.

This evidence supported the inference that a months-long territorial dispute existed between Bobby Morales and Viera on the one hand, and the Crew on the other.  When Desiree Morales interfered with the Crew's efforts to force Bobby Morales and Viera to stop selling in their territory, Cathy Morales and Nina attempted to eliminate this interference by shooting at Desiree Morales and the group she was with, which included Aisha Morales.  The fact that Nina indicated that if Cathy did not do the shooting, he himself would, also supports a finding that the motive for the shooting was at least partially a Crew conflict, not merely a personal conflict between Cathy and the women involved in assaulting her.

A rational juror could conclude that one motive for the shooting was to quash interference with the Crew's attempts to prevent Bobby Morales and William Viera from selling in their territory, and therefore that "*one* motive for the killing . . . was related to the drug conspiracy."  *Desinor*, 525 F.3d at 202.  For the same reason, a reasonable juror could conclude that the murder was committed "during and in relation to" the drug trafficking conspiracy, *Wallace*, 447 F.3d at 187.  Thus, there was sufficient evidence to support Nina's convictions for violating 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 924(j).

Nina next argues that evidence regarding three violent incidents introduced at both trials—referred to as "the Prospect Avenue Shootings," "the Kojak Shooting," and "the Bicycle Incident"—was irrelevant, or in the alternative, should have been excluded under Federal Rule of Evidence 403.  Evidence is relevant if: "[1] it has any tendency to make a fact more or less probable than it would be without the evidence; and [2] the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Rule 403 provides that "[t]he

court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. "We review evidentiary rulings for abuse of the district court's broad discretion, reversing only when the court has acted arbitrarily or irrationally." *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006) (internal quotation marks omitted). We find no abuse of discretion in the district court's decision to allow evidence related to these three incidents, as all three were probative in establishing the existence of the conspiracy, Nina's role as a leader of the conspiracy, and Nina's use of firearms in connection with the conspiracy.

The Prospect Avenue Shootings were initially triggered by a personal conflict between an occasional narcotics seller for the Crew and individuals from another drug crew referred to as the "Prospect Group." At the time of the shooting, that seller was on a park bench within the Crew's territory with another member of the Crew who sold narcotics, when individuals from the "Prospect Group" began shooting at the pair. Soon thereafter, Crew members sought out the shooters in order to retaliate, exchanging fire with three members of the Prospect Group. A week or so later, Nina and those Crew members discussed whether they should retaliate further against the individuals from the Prospect Group, and decided that retaliation was warranted. Nina provided them with firearms, and then Nina himself went out to see if the individuals from the Prospect Group were in the area. Nina observed the individuals, and alerted the other Crew members, who subsequently opened fire, although failing to hit anyone. As one of those Crew members testified, the retaliatory shootings were carried out not only to protect the targets of the original shootings, but also because the area where the shooting occurred was within the Crew's territory. Failing to respond to a shooting there would make the Crew look weak. Because the retaliatory shootings were motivated at least in part by a desire to protect Crew members and Crew territory, the shootings were evidence of the existence of the conspiracy, Nina's role as a leader of conspiracy, and Nina's use of firearms in connection with the conspiracy, and were therefore relevant.

With respect to the "Kojak shooting," on the evening of that shooting, Nina, his girlfriend, and others were within Crew territory selling crack cocaine. Kojak, a drug user who was not a Crew member, was in the area. He was under the influence of PCP, and was "acting crazy, throwing glass bottles." T2 749. Nina became frustrated with Kojak's behavior, and decided to leave the area. Prior to leaving the area, he handed another crew member a gun, and told him to "hold it down," meaning to make sure the Crew members were protected. T2 750. Kojak's erratic behavior continued. Eventually, he pulled a tree branch down, and the tree branch hit a female Crew member in the face. In response, the armed Crew member shot Kojak in the leg. The relevance of this incident is plain: Kojak was harassing Crew members engaged in the sale of narcotics within the Crew's territory, prompting Nina to provide one of those Crew members with a gun. From this incident, the jury could conclude that Nina was attempting to protect his narcotics operation. Accordingly, the Kojak shooting is also relevant to prove the existence of the narcotics

6

conspiracy, Nina's role as a leader of the conspiracy, and Nina's involvement with firearms in connection with the conspiracy.

The theft of Eduardo Rodriguez's bicycle, and the Crew's violent response to it, was also relevant evidence. Many Crew members used bicycles to look out for police and rivals, and to make narcotics deliveries. Once Crew members identified whom they believed had stolen Eduardo Rodriguez's bicycle, Nina provided another Crew member with a gun, and Crew members, including Nina, instigated a violent confrontation with associates of the bicycle thief. During the conflict, the armed Crew member attempted to fire his gun, but it jammed. This evidence of the use of armed violence to protect the Crew's property was also relevant to proving the existence of the conspiracy, Nina's role as a leader of the conspiracy, and Nina's use of firearms to advance the interests of the conspiracy.

While the district court did not make particular findings under Federal Rule of Evidence 403, the court indicated that it applied the balancing test of that Rule in determining the incidents' admissibility. We also discern no basis for concluding that the risk of unfair prejudice "substantially outweighed" the probative value of the evidence. *See* Fed. R. Evid. 403.

Nina next argues that the district court erred in denying his motion for a mistrial during the first trial after the Government questioned Stephanie Mesa about her age (16) at the time of her sexual relationship with Nina (32), and then twice referenced Mesa's age during its summation. Although such a sexual relationship could constitute the offense of rape in the third degree under New York Penal Law, *see* N.Y. Penal Law § 130.25, the jury was not made aware that the relationship was unlawful.

"A district court's denial of a motion for mistrial is reviewed for abuse of discretion." *United States v. Rodriguez*, 587 F.3d 573, 583 (2d Cir. 2009). A district court abuses its discretion when, *inter alia*, "its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008) (citation omitted). "A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial." *United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015). However, a mistrial is a "drastic remedy," *United States v. LaFroscia*, 485 F.2d 457, 458 (2d Cir. 1973) (per curiam), that should be used only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes," *United States v. Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (citation omitted).

Nina's attorney did not object at the time the testimony was elicited by the Government. It was not until the following day that the issue of the propriety of the questioning regarding the ages of Nina and Mesa arose when the district court raised it. Defense counsel indicated that he did not object for several reasons: (1) he did not want to

highlight the age-related testimony; (2) he intended to cross-examine Mesa on the subject; and (3) the ages would be in the record elsewhere, perhaps through Nina's possible testimony.[4] Then, on cross examination of Mesa, Nina's attorney further probed the relationship between Nina and Mesa, confirming with her that they indeed had had "intimate relations." T1 1972. During the Government's summation, a prosecutor twice referenced Mesa's age, although in the context of Nina employing juveniles, not in the context of their sexual relationship. Nina's counsel made no contemporaneous objection during summation, and instead moved for a mistrial at the conclusion of the summation. The district court denied the motion, holding that "part of the [Crew's] MO . . . was to bring in young people to sell." T1 2206. Nina declined a specific limiting instruction regarding the relative ages of Nina and Mesa.

The questions that pointedly elicited the ages of Nina and Mesa, immediately following testimony that their relationship was sexual, appear to have been a deliberate, improper attempt to prejudice Nina by highlighting the illegality of their sexual relations.[5] Nevertheless, we conclude that because (1) Nina's counsel consciously decided not to object to the age-related testimony; (2) Nina's counsel chose to cross-examine Mesa regarding her intimate relationship with Nina, underscoring that the existence of the relationship was relevant for impeachment purposes; (3) Mesa's age was in the record elsewhere; (4) Mesa's age was relevant to show that the Crew utilized juveniles to sell narcotics; (5) the Government's reference to Mesa's age in its summation was in connection to her drug dealing for Nina, not their sexual relationship; and (6) Nina declined a specific limiting instruction, the district court did not abuse its discretion in denying Nina's motion for a mistrial.

Nina next argues that the failure of Count One of the 2015 Indictment to allege that the narcotics conspiracy involved at least 280 grams of cocaine base and one kilogram of heroin entitles him to vacatur of that count of conviction. 21 U.S.C. § 848(e)(1)(A) provides the penalty for murder in connection with a 21 U.S.C. § 841(b)(1)(A) narcotics offense. 21 U.S.C. § 841(b)(1)(A) prohibits the distribution of, in relevant part, more than one kilogram of heroin and more than 280 grams of cocaine base. "[I]n order for a conviction or sentence on an . . . offense under § 841(b)(1)(A) . . . to be sustainable, drug quantity is an element that must always be pleaded and proved to a jury or admitted by a defendant." *United States v. Gonzalez*, 686 F.3d 122, 130 (2d Cir. 2012) (internal quotation

---

[4] "The law is well established that if, as a tactical matter, a party raises no objection to a purported error, such inaction constitutes a true waiver which will negate even plain error review." *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) (internal quotation marks omitted). Because Nina challenges the district court's denial of his motion for a mistrial following the Government's summation—which included references to Mesa's age—not the admission of the testimony itself, we do not deem Nina's claim waived.

[5] We note that the prosecutor arguing the appeal was not the prosecutor who conducted the examination of Mesa at trial.

marks and emphasis omitted). Thus, "an indictment charging an aggravated drug offense under § 841(b)(1)(A) is defective if it does not factually allege the drug quantity involved in the charged offense." *United States v. Dupree*, 870 F.3d 62, 71 (2d Cir. 2017). Nina contends that since 21 U.S.C. § 848(e)(1)(A) penalizes murder in connection with a 21 U.S.C. § 841(b)(1)(A) narcotics offense, an indictment charging a violation of 21 U.S.C. § 848(e)(1)(A) that does not allege the quantity involved is defective.

Nina concedes that he did not challenge the defect in the indictment below, and that therefore his claim is subject to plain error review. "Plain error review requires a defendant to demonstrate that (1) there was error, (2) the error was plain, (3) the error prejudicially affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Pattee*, 820 F.3d 496, 505 (2d Cir. 2016) (citation omitted).

The 2013 Indictment upon which Nina was convicted in the first trial specified that he and others conspired to distribute more than one kilogram of heroin and 280 grams of cocaine base. Since the 2015 Indictment charged homicide relating to that same conspiracy, Nina was on notice with respect to the quantities of heroin and cocaine base involved. In addition, the jury at the second trial was specifically instructed that in order to find Nina guilty of murder in connection with the drug conspiracy, they had to find, *inter alia*, that the conspiracy involved at least one kilogram of heroin or 280 grams of cocaine base, the predicate amount required. *See Dupree*, 870 F.3d at 73–74 (finding no plain error where the indictment omitted the drug quantity, but the jury was clearly instructed that quantity was an element of the offense). Accordingly, Nina cannot establish that the error "prejudicially affected his substantial rights" or "seriously affected the fairness, integrity or public reputation of judicial proceedings." *See Pattee*, 820 F.3d at 505 (citation omitted).

Nina also argues that the district court committed procedural error by ruling that the sentence imposed for his conviction under 18 U.S.C. § 924(j)(1) (Count Two of the 2015 Indictment) had to run consecutively to the other sentences imposed. Specifically, Nina argues that section 924(j) does not incorporate section 924(c)'s consecutive sentence provision. We review this claim *de novo*. *See United States v. Cassesse*, 685 F.3d 186, 188 (2d Cir. amended July 25, 2012) (holding that sentencing claims presenting questions of statutory interpretation are reviewed *de novo*).

Section 924(j)(1) authorizes the death penalty or life imprisonment for murder committed "in the course of a violation of subsection (c)." 18 U.S.C. § 924(j)(1). Section 924(c) provides for mandatory minimum prison sentences of either five, seven, or ten years for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." *Id.* § 924(c)(1)(A). Subsection (c) specifies that this penalty shall be "in addition to the

punishment provided for such crime of violence or drug trafficking crime," *id.*, and accordingly shall not "run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed," *id.* § 924(c)(1)(D)(ii).

A number of our sister circuits have held that section 924(j) incorporates the entirety of section (c), including the mandatory consecutive sentence provision. *See United States v. Bran*, 776 F.3d 276, 282 (4th Cir. 2015); *United States v. Berrios*, 676 F.3d 118, 140–144 (3d Cir. 2012); *United States v. Battle*, 289 F.3d 661, 666–69 (10th Cir. 2002); *United States v. Allen*, 247 F.3d 741, 769 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002). *But see United States v. Julian*, 633 F.3d 1250, 1253 (11th Cir. 2011) (holding that a consecutive sentence is not required under Section 924(j)). We have accepted the majority view in a summary order. *See United States v. Young*, 561 F. App'x 85, 93–94 (2d Cir. 2014). We find the reasoning of the 4th Circuit in *Bran* persuasive:

> [B]ecause of the inclusion of the § 924(c) language [in § 924(j)], to prove a violation of § 924(j), the government must prove that a defendant also committed a violation of § 924(c). Accordingly, a defendant who violates § 924(j) by definition violates § 924(c), and would necessarily face a mandatory consecutive sentence under § 924(c) if it had been charged as a freestanding offense. Therefore, to read § 924(j) as not subject to the consecutive sentence mandate of § 924(c) would mean that a defendant convicted under § 924(j) would face a more lenient sentencing scheme— under which a defendant's sentence would not have to be consecutive— simply because, in the course of violating § 924(c), he murdered someone. To read § 924(j) in this way would give rise to a truly absurd result with perverse incentives; a defendant facing life or a term of years could create a more favorable sentencing environment for himself by committing a murder during his commission of the § 924(c) offense.

776 F.3d at 282 (citations omitted).

Accordingly, the district court correctly held that imposition of a consecutive sentence for Nina's conviction under section 924(j) was mandatory.

Finally, Nina argues that his within-Guidelines sentence of life imprisonment for narcotics conspiracy in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) (Count One of 2013 Indictment) was substantively unreasonable. Appellate courts should not disturb a sentence on substantive reasonableness grounds unless it is so "shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012) (internal quotation marks omitted). Stated otherwise, "[w]e will . . . set

aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks and emphasis omitted). Moreover, "[w]hile we do not presume that a Guidelines sentence is necessarily substantively reasonable, that conclusion is warranted in the overwhelming majority of cases." *United States v. Messina*, 806 F.3d 55, 66 (2d Cir. 2015) (internal quotation marks omitted).

Nina was a leader of the Crew, employed juveniles to sell narcotics on his behalf, and during the course of the prosecution threatened two cooperating witnesses, including threatening to kill a Government cooperator during the first trial. Nina was personally involved in numerous violent acts committed by the Crew, including the murder of Aisha Morales, the Prospect Shootings, the Kojak Shooting, and the attempted shooting following the bicycle theft. Nina's criminal history dates back to 1994 when he was 16 years old, and includes convictions for attempted robbery, possession of a firearm, and attempted assault, yielding a criminal history score of VI. Under these circumstances, we reject Nina's argument that his Guidelines sentence of life imprisonment was substantively unreasonable.

We have considered Nina's remaining arguments and conclude that they are without merit. Accordingly, the judgment of the district court is **AFFIRMED.**

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

11