23-657-cv
*Lupia v. New Jersey Transit Rail Operations, Inc.*

# In the
# United States Court of Appeals
## for the Second Circuit

————

AUGUST TERM 2023

No. 23-657-cv

SCOTT LUPIA,
*Plaintiff-Appellee*,

v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,
*Defendant-Appellant*.

————

On Appeal from the United States District Court for the Southern
District of New York

————

ARGUED: FEBRUARY 27, 2024
DECIDED: AUGUST 1, 2024

————

Before: CALABRESI, CABRANES, and LOHIER, *Circuit Judges*.

————

The Locomotive Inspection Act ("LIA") makes it unlawful to use a locomotive on a railroad carrier's railroad line when the "parts and appurtenances" of the locomotive are not "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. The principal question on appeal is whether an air conditioning ("A/C") unit may qualify as one of the "parts and appurtenances" of a locomotive under the LIA. The United States District Court for the Southern District of New York (Lewis J. Liman, *Judge*) held that a temperature control system is one of the "parts and appurtenances" of a locomotive. Further, if a carrier creates a temperature control system based on an A/C unit, then the LIA requires that the carrier maintain that system in "proper condition and safe to operate without unnecessary danger of personal injury." We agree.

The judgment of the District Court is **AFFIRMED**.

———

STEPHEN J. FITZGERALD, Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C., New Haven, CT (Joshua R. Goldbaum, Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C., New Haven, CT; Charles C. Goetsch, Charles Goetsch Law Offices, LLC, New Haven, CT, *on the brief*), *for Plaintiff-Appellee.*

BRIAN R. TIPTON, Florio Perrucci Steinhardt Cappelli Tipton & Taylor, LLC, Easton, PA, *for Defendant-Appellant*.

———

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal arises from Plaintiff-Appellee Scott Lupia's claim under the Federal Employers' Liability Act ("FELA") against Defendant-Appellant New Jersey Transit Rail Operations, Inc. ("NJT"). Lupia, formerly an engineer for NJT, was injured when his cab overheated due to a faulty air conditioning ("A/C") unit. Lupia alleged that NJT violated FELA by failing to provide him with a locomotive with all of its "parts and appurtenances" safe to operate in violation of the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701.

We are asked whether an A/C unit may qualify as one of the "parts and appurtenances" of a locomotive under the LIA. The United States District Court for the Southern District of New York (Lewis J. Liman, *Judge*) determined that a temperature control system is "one of the parts and appurtenances" of a locomotive. Further, if a carrier creates a temperature control system based on an A/C unit, then the LIA requires that the carrier maintain that system in "proper condition and

3

safe to operate without unnecessary danger of personal injury."[1] We agree.

The judgment of the District Court is **AFFIRMED**.

## BACKGROUND

At the time of the events in question, NJT employed Plaintiff-Appellee Scott Lupia as a locomotive engineer in NJT's Hoboken Division. On July 21, 2020, Lupia entered the cab of his assigned locomotive at Penn Station to discover that the cab's A/C unit was not working. Lupia notified his supervisors, who measured the cab's temperature at 114 degrees Fahrenheit. Lupia was nonetheless ordered to operate the train as scheduled. Approximately forty minutes after departing from Penn Station, Lupia collapsed from heat exhaustion, suffering head and neck injuries which resulted in permanent, career-ending disabilities.

Lupia initiated this action against his former employer alleging that NJT violated the Federal Employers' Liability Act ("FELA").[2] Lupia's principal theory of liability is that NJT violated FELA by failing to

---

[1] 49 U.S.C. § 20701.

[2] 45 U.S.C. § 51. Section 51 provides that "[e]very common carrier by railroad while engaging in [interstate or foreign] commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce."

4

provide him with a locomotive with all of its "parts and appurtenances" safe to operate as required by the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701, and that as a result of such violation, Lupia was injured.

NJT moved for summary judgment on Lupia's claim under the LIA, arguing that the A/C unit was not one of the "parts and appurtenances" of the locomotive. The District Court denied NJT's motion, holding that a "temperature control system" was one of the "parts and appurtenances" of a locomotive, and the evidence at summary judgment demonstrated that NJT had elected to control cab temperature by A/C unit.[3] The District Court further held that Lupia had adduced sufficient evidence that NJT's "temperature control system was not in a proper condition and safe to operate without unnecessary danger of personal injury."[4] Lupia thus proceeded to trial on the LIA claim.

During the cross-examination of one of NJT's witnesses, the District Court permitted Lupia to introduce a Rail Asset Management Systems ("RAMS") report prepared by NJT mechanical staff to impeach NJT's

---

[3] *Lupia v. New Jersey Transit Rail Operations, Inc.*, No. 21-CV-11077, 2022 WL 17904551, at *7 (S.D.N.Y. Dec. 23, 2022).

[4] *Id.* at *8.

witness.[5] The District Court observed that "[t]here was testimony on direct examination about the standard of care" exercised by NJT and that it was "perfectly appropriate on cross examination for counsel to inquire into that" by introducing the RAMS report, which showed that the A/C unit in Lupia's cab remained broken five days after Lupia's collapse.[6]

Before summations and over NJT's objections, the District Court permitted Lupia "to argue to the jury that a fair measure of the noneconomic damages is a multiple of two or three or more of what [Lupia had] argued is . . . the economic damages."[7] The District Court noted that "[t]he Second Circuit has repeatedly cautioned against allowing counsel to mention a specific dollar amount for pain and suffering, but also has left it to the discretion of the district judge whether to permit such arguments, [] to impose reasonable limits," or include cautionary jury instructions.[8]

---

[5] Joint Appendix ("JA") 538-39.

[6] *Id.* at 536.

[7] *Id.* at 654. The District Court also instructed the jury that "[a]ny dollar figure suggested by plaintiff's counsel as appropriate relief in this case is only a comment on the evidence or a suggestion. Such a suggestion is not evidence, and you are free to disregard it." *Id.* at 701.

[8] JA 661-62 (citing *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1016 (2d. Cir. 1995), *vacated on other grounds sub nom., Consorti v. Owens-Corning Fiberglas*

6

The jury returned a verdict in favor of Lupia and awarded Lupia $450,000 for past lost earnings, $3,667,189 for future impairment to earning capacity, $900,000 for past pain and suffering, and $6,600,940 for future pain and suffering. NJT timely appealed.

**DISCUSSION[9]**

The principal question presented is whether the District Court erred in denying, in part, NJT's motion for summary judgment. NJT argued that a faulty A/C unit does not violate § 20701 of the LIA and, by extension, does not establish strict liability under FELA.

Section 20701 of the LIA provides that a railroad carrier may operate a locomotive "only when the locomotive . . . and *its parts and appurtenances* . . . are in proper condition and safe to operate without unnecessary danger of personal injury."[10] "[F]ailure to violate a

---

*Corp.*, 518 U.S. 1031 (1996)); *Mileski v. Long Island R. Co.*, 499 F.2d 1169, 1174 (2d Cir. 1974)).

[9] Our review is *de novo*. *See Power Auth. v. M/V Ellen S. Bouchard*, 968 F.3d 165, 170 (2d Cir. 2020) ("We review a grant of summary judgment *de novo*; specifically, where the disposition presents only a legal issue of statutory interpretation, as here, we review *de novo* whether the district court correctly interpreted the statute." (quotation marks omitted)).

[10] 49 U.S.C. § 20701 (emphasis added).

specific federal regulation [does not] immunize[] [a carrier] from liability."[11] That is, NJT may still violate the LIA if the "parts and appurtenances" of its locomotive are unsafe.

In *Southern Railway Co. v. Lunsford*, the Supreme Court held that an experimental braking device was not one of the "parts and appurtenances" of a locomotive for the purposes of the Boiler Inspection Act ("BIA"), the LIA's predecessor statute.[12] The Court explained that "mere experimen[t]al devices which do not increase the peril, but may prove helpful in an emergency," were not "parts and appurtenances" for the purposes of the BIA.[13] By contrast, "[w]hatever in fact is an *integral or essential part of a completed locomotive . . .* [was] within the statute."[14]

We agree with the District Court that a temperature control system is an integral or essential part of a completed locomotive. NJT does not dispute this. After all, a locomotive cannot operate safely if its engineer

---

[11] *Whelan v. Penn Cent. Co.*, 503 F.2d 886, 890 (2d Cir. 1974).

[12] 297 U.S. 398, 402 (1936).

[13] *Id.*

[14] *Id.* (emphasis added).

is incapacitated from exposure to extreme heat.[15] We also agree that if a carrier bases its temperature control system on an A/C unit, then the LIA requires that the carrier maintain that A/C unit in proper condition and safe to operate without unnecessary danger of personal injury. Accordingly, the District Court properly denied, in part, NJT's motion for summary judgment.

The Supreme Court observed that although the LIA's predecessor statute "required a condition which would permit use of the locomotive without unnecessary danger," it often "left to the carrier the choice of means to be employed to effect that result."[16] Here, there was a range of options available for NJT to limit employee heat exposure. According to the FRA, these included:

> isolation from heat sources such as the prime mover; reduced emissivity of hot surfaces; insulation from hot or cold ambient environments; heat radiation shielding including reflective shields, absorptive shielding, transparent shielding, and flexible shielding; localized workstation heating or cooling; general and spot (fan) ventilation;

---

[15] The Federal Railroad Administration (FRA) observes that human performance decreases "when temperatures increase above 80°F, and that performance decreases to an even greater extent when the temperature increases above 90°F." Locomotive Safety Standards, 77 Fed. Reg. 21312-01, 21319 (Apr. 9, 2012).

[16] *Baltimore & O. R. Co. v. Groeger*, 266 U.S. 521, 530 (1925).

evaporative cooling; [and] chilled coil cooling systems.[17]

We assume for present purposes that an A/C unit is not essential or integral to a completed locomotive if the same or similar effect is achieved by one or more other temperature-regulating options. However, once NJT chose—from among the options available—to base its temperature control system on an A/C unit, the A/C unit became one of the essential "parts and appurtenances" of the locomotive.[18] NJT was thus obligated to maintain the A/C unit in proper condition and safe to operate without unnecessary danger of personal injury.

---

[17] 77 Fed. Reg. at 21319.

[18] NJT's opening brief argues that the A/C unit was not one of the essential "parts and appurtenances" of the locomotive because Lupia "had the ability to open the windows of the cab, which was properly ventilated notwithstanding the presence of a functioning air conditioning unit." Appellant's Br. 20. NJT also claims that the A/C unit was merely "one component of the temperature control system" of the train cab. *Id.* at 6. To the extent that NJT purports to challenge the District Court's factual determination at summary judgment that NJT "chose to use an A/C" unit as its "temperature control system," or that it was the "A/C system that allowed the locomotive to have a functioning system to control cab temperature," *Lupia v. New Jersey Transit Rail Operations, Inc.*, 2022 WL 17904551, at *7, we reject the argument as barred by NJT's failure to make a Rule 50 motion below. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023) ("[A] party must raise a sufficiency-of-the-evidence claim in a post-trial motion to preserve it for appeal.").

We have considered NJT's remaining challenges to the District Court's rulings and find them to be without merit.[19]

## II. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.

---

[19] As to NJT's arguments that the District Court erred in allowing Lupia's counsel to make remarks at trial regarding the calculation of pain and suffering and that the District Court erred in admitting the locomotive safety report (RAMS report) for impeachment purposes at trial, we review these rulings for "abuse of discretion." *See United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) ("We review a district court's rulings on the admissibility of trial evidence for abuse of discretion."); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997) (declining to "adopt a per se rule prohibiting counsel from suggesting a specific sum as [noneconomic] damages" and endorsing "a more flexible approach" which leaves the issue "to the discretion of the trial judge"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Finding no "abuse of discretion" in the District Court's decisions, we affirm for substantially the reasons given by Judge Liman. *See* text accompanying notes 5-8, *ante*.

11